**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
KALESHA NILES, JASON LAHEY, NICOLE
LOCKHART, BOBBI O'SULLIVAN and ALEXIS
JADE HUNTER *on behalf of themselves, the general*
*public and those similarly situated,*

|  |  |
|---|---|
| Plaintiffs, | **REPORT AND** |
|  | **RECOMMENDATION** |
| -against- | CV 19-1902 (GRB) (ARL) |

ARIZONA BEVERAGES USA LLC, BEVERAGE
MARKETING USA, INC. and HORNELL
BREWING CO., INC.,

                                                    Defendants.
-----------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

Before the Court, on referral from District Judge Brown,[1] is the motion of the defendants,

Arizona Beverages USA LLC ("ABU"), Beverage Marketing USA, Inc. ("BMU") and Hornell

Brewing Co., Inc. ("Hornell") (collectively, "the defendants"), to dismiss the amended complaint

filed by the plaintiffs, Kalesha Niles ("Niles"), Jason Lahey ("Lahey"), Nicole Lockhart

("Lockhart"), Bobbi O'Sullivan ("O'Sullivan") and Alexis Jade Hunter ("Hunter") (collectively,

"the plaintiffs"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and to strike

the nationwide class of claims under Rule 12(f).  For the reasons set forth below, the undersigned

respectfully recommends that the motion be granted, in part, and denied, in part.

## BACKGROUND

### A.    Procedural History

The plaintiffs, Niles and Lahey, commenced this putative class action lawsuit on April 2,

---

[1] This motion was initially referred to the undersigned by District Judge Feuerstein.  On June 3, 2021, the case was reassigned to District Judge Brown.  By order dated June 16, 2021, Judge Brown indicated that the motion to dismiss remains referred to the undersigned for a report and recommendation.

2019, against the defendants, BMU, Hornell, Arizona Beverage Company LLC ("ABC"), ABU and Arizona Iced Tea LLC ("AIT"),[2] asserting claims for fraud, misrepresentation, breach of express and implied warranties, unjust enrichment/restitution and violations of multiple state consumer protection statutes (the "Niles Action").  ECF No. 1.  The crux of Niles' and Lahey's initial complaint was that Arizona Green Tea with Ginseng and Honey was marketed by the defendants as containing "Ginseng for energy," but two different labs were unable to detect any ginsenosides in the product, a key chemical compound found in ginseng.  On the same day, Lockhart, O'Sullivan and Hunter filed a complaint against the defendants in the United States District Court for the Northern District of California ("the Lockhart Action").  *See* 19-5345, ECF No. 1.  Lockhart, O'Sullivan and Hunter sued the defendants for fraud, violations of the California Unfair Competition Law ("CUCL"), California False Advertising Law ("CFAL") and the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. ("CLRA"), and for negligent misrepresentation.  *Id.*

On June 13, 2019, the defendants filed a motion to dismiss the complaint or to transfer venue in the Lockhart Action.  *See* 19-5345, ECF No. 17.  On September 9, 2019, the defendants filed a motion to dismiss the complaint in the Niles Action.  ECF No. 21.  Nine days later, the Lockhart Action was transferred to this Court and was assigned to District Judge Chen.  *See* 19-5345, ECF No. 38.  Later that day, the case was reassigned to District Judge Feuerstein as a related action.  Despite the fact that the motion to dismiss filed in Lockhart Action remained *sub judice* when the case was transferred, on November 5, 2019, District Judge Feuerstein only referred the motion to dismiss filed in the Niles Action to the undersigned.  Accordingly, on April 16, 2020, the undersigned issued a report and recommendation recommending that the

---

[2] ABC and AIT are no longer named as defendants.  ECF No. 35.

motion filed in the Niles Action be granted, in part.  Specifically, the undersigned recommended dismissal of the plaintiffs' claim for injunctive relief, claim with regard to the statement "just the right amount of ginseng" and claims for breach of express and implied warranty and unjust enrichment.  The undersigned also recommended that the claims for fraud and negligent representation be dismissed with leave to amend.

In late April, both parties filed objections to the report and recommendation in the Niles Action and, on the same day, requested a conference before Judge Feuerstein in the Lockhart Action.  The following day, in response to the request for a conference in the Lockhart Action, District Judge Feuerstein entered the following electronic order to show cause:

> ORDER TO SHOW CAUSE: Plaintiffs commenced this action against Defendants in the U.S. District Court for the Northern District of California on 4/2/19. On that same date, a second action was filed in this District, 19-cv-1902 Niles v. Beverage Marketing USA, Inc. ("Niles"). Defendants moved before the Northern District of California, the Honorable William H. Orrick, presiding, to dismiss the instant action, or, alternatively, transfer it to this District as related to Niles. On 9/11/19, Judge Orrick granted Defendants' motion to transfer, finding that relief appropriate since "the factual bases of the claims are identical, the defendants are identical, and the plaintiff and defense counsel are identical." See 38 . The matter was transferred to this District and ultimately assigned to the undersigned as related to Niles. Interests of judicial efficiency suggest that these cases be consolidated for all purposes. Accordingly, the parties are hereby ORDERED to show cause, by serving and electronically filing a letter no later than 5:00 p.m. on 5/8/20 why this action should not be consolidated with Niles. Failure to timely respond to this Order will result in issuance of an order directing consolidation of the matters without further notice.

One week later, by order dated May 8, 2020, the Lockhart and Niles Actions were consolidated. In that order, District Judge Feuerstein indicated that if the Court, in connection with the adjudication of the motion to dismiss in the Niles Action, denied the motion or otherwise granted leave to amend, the Niles and Lockhart plaintiffs would be required to file a consolidated amended complaint.  Upon the filing of a consolidated amended complaint, the motion to dismiss

in the Lockhart Action would then become moot without prejudice to the defendants' rights to file a responsive pleading and without waiver of any of the defendants' rights and defenses.

On June 24, 2020, District Judge Feuerstein adopted the undersigned's Report and Recommendation in its entirety.  On July 31, 2020, pursuant to the Court's directions, the plaintiffs filed an amended complaint, which is now the operative pleading in the consolidated action.  ECF No. 35.  The amended complaint includes a revised fraud and negligent misrepresentation claim and reasserts some of the same claims that were dismissed in the Niles Action on behalf of the newly added California plaintiffs.  It also alleges violations of several California consumer protection statutes.  Most notably, the amended pleading clarifies the underlying misrepresentation.  The plaintiffs now that the reason the Product lacks ginsenosides is that the defendants use Eleutherococcus senticosus ("eleuthero") rather than Panax Ginseng. On October 5, 2020, the defendants moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and to strike the nationwide class of claims under Rule 12(f).

### B.    Factual Averments

Although the Court presumes the parties' familiarity with the facts of this case, the undersigned will restate the facts to provide District Judge Brown with a context for the undersigned's determination.  Those facts are drawn from the amended complaint and are accepted as true for purposes of the instant motion.  *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).  These facts, however, do not constitute findings of fact by the Court.  *See Colvin v. State University College at Farmingdale*, No. 13-CV-3595 (SJF)(ARL), 2014 U.S. Dist. LEXIS 85678, 2014 WL 2864224, at *1 n.1 (E.D.N.Y. June 19, 2014).

1.      **The Parties**

Niles is a resident of Gloversville, New York.  Am. Compl. ¶ 16.  Lahey is a resident of

Lee's Summit, Missouri.  *Id.* ¶ 17.  Lockhart is a resident of Huntington Beach, California.  *Id.* ¶

18.  O'Sullivan is a resident of Petaluma, California.  *Id.* ¶ 19.  Hunter is a resident of

Hawthorne, California.  *Id.* ¶ 20.  The defendants are among the world's largest producers of

canned and bottled beverages.  *Id.* ¶ 3.  Specifically, the defendants produce, market, and

distribute non-alcoholic beverages for sale to consumers under the brand name "AriZona." *Id.* ¶

32.  The beverages are sold throughout the United States in convenience stores and supermarkets

such as Walmart, Kroger, Safeway, Costco and Target.  *Id*.  The defendants' flagship product is

"Green Tea with GINSENG and HONEY" (the "Product").  *Id.* ¶ 4.

ABU, BMU and Hornell all have a principle place of business in Woodbury, New York.

*Id.* ¶¶ 21-3.  ABU is responsible for the manufacturing, labeling, distribution, sales and

marketing of the Product.  *Id.* ¶ 21.  Hornell is an "affiliate of AriZona Beverages" and is

involved in the marketing and distribution of the defendants' beverages.  *Id.* ¶ 22.  BMU is the

legal parent of Hornell that owns the copyrights for the AriZona labels.  *Id.* ¶ 23.

2.      **The Alleged Mislabeling**

All versions of the Product, that is, cans, bottles, gallon-size, etc., include the following

six words: "Green Tea with GINSENG and HONEY." *Id.* ¶ 6.  The Product also uses labels that

include the statement "Ginseng for energy."  *Id.*  According to the plaintiffs, consumers

generally understand that ginseng is a cure for low energy.  *Id.* ¶ 7.  To this end, the plaintiffs

allege that Panax Ginseng, in particular, is purported to boost energy and improve mood.  *Id.*

The defendants do not use Panax Ginseng in the Product.  Instead, they use eleuthero,

commonly known as "Siberian Ginseng."  *Id.* ¶ 10.  The plaintiffs contend that eleuthero is not

true ginseng because it does not contain ginsenosides. *Id.* ¶¶ 7, 12. The plaintiffs further contend that the Food and Drug Administration (the "FDA") has defined ginseng as Panax, not eleuthero, and therefore, the defendants' representations that the Product contains "Ginseng for energy" is patently false. *Id.* ¶ 43.

The plaintiffs alternatively complain that the product does not contain enough ginseng to provide energy to consumers. *Id.* ¶ 34. To this end, they assert that their counsel has retained two respected food laboratories to conduct three tests of the Product for ginsenosides. *Id.* ¶ 56. None of the three tests were able to detect any ginsenosides in the Product. *Id.* Although the plaintiffs acknowledge that their findings are consistent with the defendants' statement that they use Siberian Ginseng, the plaintiffs still contend that their testing further shows that the Product does not contain ginseng from the Panax family or that the amount of Panax ginseng is so miniscule it cannot be detected. *Id.*

Finally, the plaintiffs point to a 2015 FDA Import Alert that references a law prohibiting the use of the term "Siberian Ginseng" to sell products with eleuthero. *Id.* ¶ 49. Counsel for the defendants has provided the Court with FDA Import Alert 54-12, which describes the law and the FDA's current guidance regarding "Foods Labeled As Being Or Containing Siberian Ginseng." Donovan Decl. Ex. B. Specifically, the alert provides:

> Section 10806(b)(l) of the Farm Security and Rural Investment Act of 2002 (the Farm Bill) (Pub.L.107-171), signed into law on May 13, 2002, by President Bush, provides that the term "ginseng" may only be considered to be a common or usual name (or part thereof) for any herb or herbal ingredient derived from a plant classified within the genus Panax, and only labeling or advertising for herbs or herbal ingredients classified within that genus may include the term "ginseng." Section 10806(b)(2) amended section 403 of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 343) by adding the provision that a food or dietary supplement is misbranded "if it purports to be or is represented as ginseng, unless it is an herb or herbal ingredient derived from a plant classified within the genus Panax." (Section 403(u) of the Act) (21 U.S.C. 343 (u)).

> This amendment to the Act means that no food, food ingredient, dietary ingredient or dietary supplement may be identified as "ginseng" unless it is a botanical within the genus Panax. However, many dietary supplements and their ingredients that are or that contain the botanical Eleutherococcus senticosus are often identified using the term "Siberian ginseng." Because plants within the genus eleutherococcus are not the same genus as Panax, these products cannot use the term "ginseng" in their name.
>
> Accordingly, the dietary ingredient Eleutherococcus senticosus or a dietary supplement containing it must identify the ingredient using the Latin binomial Eleutherococcus senticosus or the standardized common name "eleuthero." The term "Siberian ginseng" cannot be used.

*Id.*

### 3.    The Plaintiffs' Experience with the Product

Niles purchased the Product many times over the past three years. *Id.* ¶ 78. For example, in February 2019, Niles purchased a gallon jug of the Product from Walmart in Gloversville, New York. *Id.* She has also purchased the 23-ounce can of the Product. *Id.* Lahey has also purchased the Product several times over the years, including one time in September 2018 from a Hy-Vee grocery store in Lee's Summit, Missouri. *Id.* ¶ 80. Lockhart alleged that she purchased the Product many times within California, including once in July 2018 at Ralph's grocery store in Fountain Valley, California. *Id.* ¶ 82. She also purchased both a gallon jug and the 23-ounce can of the Product. *Id.* O'Sullivan purchased the Product within California within the past three years, including once in July 2018 at Safeway near her home in Petaluma, California. *Id.* ¶ 84. Lastly, Hunter purchased a gallon jug of the Product in July 2018 at Ralph's grocery store in Hawthorne, California. *Id.* ¶ 86.

Each of the plaintiffs allege that when he or she purchased the Product, he or she generally understood that ginseng was a natural, healthy, energy-providing ingredient and, in making the purchase, relied on the defendants' representations that the Product contained

"Ginseng for energy." *Id.* ¶¶ 78-87.  The plaintiffs further claim that had they known that the Product was made with eleuthero extract or that the Product did not contain sufficient ginseng to provide them with energy, they would not have purchased the Product or, at a minimum, would have expected to pay less for it.  *Id.*  The plaintiffs also contend that they still desire to purchase teas with true Panax Ginseng, like the defendants' Rx Energy drink, especially if those teas have sufficient quantities of ginseng to provide energy.  *Id.* ¶ 88.  Finally, they claim that the defendants' practices with respect to the Product have caused them ongoing uncertainty and anxiety.  *Id.*

## DISCUSSION

### A.    Standards of Law

### 1.    12(b)(1)

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), a federal court must dismiss a claim when it lacks jurisdiction over the subject matter of the action.  *See* Fed. R. Civ. P. 12(b)(1); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.").  The party asserting subject matter jurisdiction has the burden to prove the Court's jurisdiction by a preponderance of the evidence.  *See Vailette v. Lindsay*, No. 11-cv-3610, 2014 WL 4101513, at *3 (E.D.N.Y. Aug. 18, 2014).

In deciding a motion to dismiss for lack of subject matter jurisdiction, the court must assume that all factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-moving party.  *C.K. v. Bd. of Educ. of the Westhampton Beach Sch. Dist.*, 185 F. Supp. 3d 317, 324 (E.D.N.Y. 2016).  Further, the court may refer to evidence outside the

pleadings, such as affidavits, to resolve the jurisdictional issue. *Forbes v. State Univ. of New York at Stony Brook*, 259 F. Supp. 2d 227, 231-32 (E.D.N.Y. 2003).

### 2.    12(b)(6)

In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient "to raise a right to relief above the speculative level." *See Swiatkowski v. Citibank*, 745 F. Supp. 2d 150, 162 (E.D.N.Y. 2010), *aff'd*, 446 F. App'x 360 (2d Cir. 2011) (citing *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir.2010)). The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (internal citations omitted)).

The defendants contend that a number of grounds exist to dismiss the amended complaint. Each of the grounds will be addressed in turn.

### B.    Standing

To begin with, the defendants argue that the plaintiffs' claim for injunctive relief is

barred under the law of the case doctrine and Article III.  The law of the case doctrine and Article III standing are different issues that require separate consideration. "The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal quotation marks omitted)).  In this case, the Court has already ruled that Niles and Lahey were barred from seeking injunctive relief.  *See Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 953 (2d Cir. 1964) (applying law of the doctrine case despite difference in party plaintiffs).  However, in addition to adding new parties, the plaintiffs have also asserted several new facts in the amended complaint. Moreover, the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.  *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).  Accordingly, the Court chooses to address the standing argument under Article III rather than rely on its prior decision.

To establish Article III standing, a plaintiff must show "that (1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is likely to redress the injury." *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 564 (S.D.N.Y. 2016) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).  A plaintiff must also demonstrate standing for each claim and form of relief sought.  *Id.*  Therefore, in this case, the plaintiffs must all demonstrate that they have standing to seek injunctive relief based on the allegations pleaded in the amended complaint.  To this end, the plaintiffs "cannot rely on a past injury alone because '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing,

present adverse effects.'" *Id.* (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)). "Rather, the plaintiff[s] must 'demonstrate that [they are] likely to be harmed again in the future in a similar way.'" *Id*. (quoting *Nicosia v. Amazon*, 834 F.3d 220, 239 (2d Cir. 2016)). In addition, "[t]here is no exception to demonstrating future injury when the plaintiff is pursuing a class action." *Id.* (citing *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 n.20, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976) ("That a suit may be a class action, however, adds nothing to the question of standing. . ..")). As such, the five named plaintiffs in this action must themselves have standing to seek injunctive relief.

As noted above, the plaintiffs in this consolidated action hail from three states and assert claims under the consumer protection statutes of all 50 states, in particular California. *Id.* ¶¶ 123-46. With respect to their claim for injunctive relief, the plaintiffs assert:

> Plaintiffs continue to desire to purchase teas with true Panax ginseng, especially Products with sufficient quantities of ginseng to provide energy, including brands marketed and sold by Defendants. . .. Defendants introduce new products periodically and may reformulate existing products. Plaintiffs regularly visit stores where Defendants' beverages are sold. . .. Absent the injunctive relief requested, Plaintiffs are unable to rely on the phrase "with Ginseng" and similar representations on Defendants' labels when shopping for beverages because Plaintiffs do not know the formula for Defendants' products and cannot test whether or not the beverages are made using ginseng instead of eleuthero before making their purchases. . ..
>
> Moreover, in the event Defendants actually use Panax ginseng in the future, Plaintiffs will likely be misled again by the representation "Ginseng for energy," absent an injunction that prohibits Defendants from using that representation or substantially similar representations (unless the Product actually contains sufficient amount of ginseng to provide energy) because Plaintiffs cannot determine, other than by relying on such representations, whether there is sufficient ginseng to provide any energy.

Am. Compl. 88-9. Repeating virtually the same allegations that Niles and Lahey included in the initial complaint, the five plaintiffs simply state that they have a continued desire to purchase teas with Panax. In fact, the closest the plaintiffs come to asserting allegations of continuing

future harm is that they are unable to rely on the phrase "with ginseng" and thus, will be "afflicted with uncertainty" when they purchase beverages. *Id.* ¶¶ 88-91. In other words, the defendants have allegedly damaged the plaintiffs ability to make informed decisions regarding the beverages they want to buy. *Id.* The plaintiffs also suggest the defendants introduce new products all the time and, if the Product was reformulated in such a way that it would include a level of ginseng sufficient to provide energy, the plaintiffs would purchase the Product in the future. The undersigned, once again, finds that these allegations are insufficient to allege future injury individually or on behalf of the putative class. Accordingly, the undersigned recommends that the plaintiffs' claim for injunctive relief be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).[3]

## C.    The Doctrine of Conflict Preemption

The defendants next argue that all of the plaintiffs' claims regarding the presence of eleuthero or an insufficient amount of Panax are expressly preempted by the Food Drug and Cosmetic Act ("FDCA"), as amended by the Nutrition Labeling and Education Act, 21 U.S.C. § 343 *et seq*. ("NLEA").[4] Specifically, the defendants contend that since the plaintiffs now allege a direct violation of the FDCA, the plaintiffs were required to plead compliance with a 12-sample test methodology, which will be discussed in detail below. For the reasons that follow, the

---

[3] As noted above, the plaintiffs' claim for injunctive relief on behalf of a putative class should also be dismissed. *See* Am. Compl. ¶ 145. The Second Circuit has held that past purchasers of products like the plaintiffs in this case "do not have the sort of perpetual relationship with the producer of a consumer good that is typical of plaintiffs and defendants in Rule 23(b)(2) class actions." *Berni v. Barilla S.p.A.,* 964 F.3d 141, 147 (2d Cir. 2020).

[4] The defendants raised a similar argument in their motion to dismiss the initial complaint. Specifically, there, the defendants had argued that although the plaintiffs had failed to plead a violation of the FDCA, or any regulation thereunder, their claim that the Product did not contain enough ginseng or "Panax" to provide "energy" triggered the issue of conflict preemption. They argued, in this regard, that any decision in the plaintiffs' favor would have created a new standard for establishing the presence of ginseng in a product. In recommending denial of the motion, the undersigned found that the state laws relied upon by the plaintiffs were not, in and of themselves, in conflict with the FDCA's definition of ginseng. The Court also rejected the defendants' argument that that if the plaintiffs were successful in this suit, the resulting labeling restrictions would create new and conflicting standards for the labeling of products containing ginseng.

undersigned disagrees.

### 1. The Federal Regulatory Scheme

"Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, state laws that 'interfere with, or are contrary to the laws of Congress, made in pursuance of the [C]onstitution' are invalid.'" *Ackerman v. Coca-Cola Co*., No. CV-09-0395 (JG), 2010 WL 2925955, at *6 (E.D.N.Y. July 21, 2010)(citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 211, 6 L. Ed. 23 (1824)). Indeed, "[a]n otherwise valid state law is preempted if: (1) Congress expressly preempts the state law; (2) Congress completely occupies the law's field of operation; (3) compliance with both federal and state law is impossible; or (4) the state law presents an obstacle to the achievement of the full purposes and objectives of Congress." *Id.* "[W]here Congress provides an express preemption clause, the presumption against preemption requires courts to read the clause narrowly." *Id.* The 1990 amendments to the FDCA include such a clause with respect to food labeling requirements. *Melendez v. ONE Brands, LLC*, No. 18 CV 6650 CBA SJB, 2020 WL 1283793, at *4 (E.D.N.Y. Mar. 16, 2020).

Notably, "[t]he FDCA empowers the [FDA] to . . . protect the public health by ensuring that 'foods are safe, wholesome, sanitary, and *properly labeled*.'" *Id.* (citing 21 U.S.C. § 393(b)(2)(A)) (emphasis added). To enable the FDA to do so, Congress has authorized the FDA "to promulgate regulations pursuant to this authority." *Id*. (citing 21 C.F.R. § 7.1 *et seq*.).[5] In addition, in 1990, consistent with the statute's purpose of promoting uniform national labeling standards, "[t]he NLEA was passed to 'clarify and to strengthen the [FDA's] legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may

---

[5] For example, the FDCA prohibits the misbranding of drinks. *See POM Wonderful LLC v. Coca-Cola Co*., 573 U.S. 102, 108–09, 134 S. Ct. 2228, 2234–35, 189 L. Ed. 2d 141 (2014) (citing 21 U.S.C. §§ 321(f), 331. A drink is considered to be misbranded if "its labeling is false or misleading." *Id.* (citing 21 U.S.C. § 343(a)).

be made about the nutrients in foods.'" *Id.* (citing *Nutritional Health All, v. Shalala*, 144 F.3d

220, 223 (2d Cir. 1998) (citing H.R. Rep. No. 101–538, at 7 (1990)).  With respect to the latter,

the NLEA explicitly preempts any state law that establishes any requirement for the labeling of

food that is *not identical to*, among other things, the requirement of section 343(q), which

addresses the inclusion of nutrition information on labels.  *See* 21 U.S.C. § 343-1(a)(4)

(emphasis added).

    "[N]ot identical to" means that "the State requirement directly or indirectly imposes

obligations or contains provisions concerning the composition or labeling of food" that are "not

imposed by or contained in the applicable provision [or regulation]" or "[d]iffers from those

specifically imposed by or contained in the applicable provision [or regulation]." 21 C.F.R. §

100.1(c)(4).  However, the NLEA makes clear that the statute shall not be construed to preempt

any provision of State law, unless such provision is expressly preempted under 21 U.S.C. § 343-

1(a) ] of the [FDCA].  *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241, 245

(S.D.N.Y. 2019).  Accordingly, plaintiffs may avoid the statute's preemptive force: "(1) if the

plaintiffs' claims seek to impose requirements that are identical to those imposed by the FDCA;

or (2) if the requirements plaintiffs seek to impose are not with respect to claims of the sort

described in [the statute]."  *Ackerman*, 2010 WL 2925955, at *6.

    **2.**    **Application to the Allegations**

    Although the plaintiffs have not, as the defendants suggest, set forth a specific cause of

action for violation of the FDCA, the plaintiffs' amended state law claims are certainly based on

two related theories: (1) the Product is labeled as containing "ginseng" despite the fact that it is

made with eleuthero and (2) the Product does not contain enough ginseng to provide energy.

Am. Compl. ¶¶ 43-54.  The parties agree that the FDCA has established requirements for the use

14

of the term ginseng on food labels.  Notably, section §321d(b)(l ) of the FDCA provides:

> Notwithstanding any other provision of law, for purposes of the [FDCA]
>
>  (A)  the term "ginseng" may only be considered to be a common or usual name (or part thereof) for any herb or herbal ingredient derived from a plant classified within the genus Panax; and
>
> (B)  only labeling or advertising for herbs or herbal ingredients classified within that genus may include the term "ginseng."

21 U.S.C. § 321d(b)(l ).  In addition, 21 U.S.C. § 343(u) states that a food shall be deemed misbranded "[i]f it purports to be or is represented as ginseng, unless it is an herb or herbal ingredient derived from a plant classified within the genus Panax." 21 U.S.C. § 343(u).  The plaintiffs allege that they have tested the Product and it is made with eleuthero, commonly known as "Siberian Ginseng," which is not ginseng as defined by the FDCA.  Am. Compl. ¶¶ 43-55.

The defendants do not dispute that they use Siberian Ginseng in the Product.  In fact, on the frequently asked questions ("FAQ") page of their website, the defendants have posted the following question and answer: "What Type of Ginseng Do You Use?" "We use Siberian Ginseng in the Green Teas and Panax Ginseng in the Rx Stress." *Id.* ¶ 48.  Nor do they argue that FDCA provisions relied upon by the plaintiffs, that is, 21 U.S.C. § 321d(b)(l ) and § 343(u), are inapplicable.  In fact, the defendants no longer contend that the state consumer protection acts listed in the amended complaint require anything different than what is imposed under 21 U.S.C. § 321d(b)(l ) or 21 U.S.C. § 343(u).  Nevertheless, the defendants argue that any state law claim asserting a failure to meet "the requirements of the NLEA" is preempted absent a statement that the party has complied with the 12-sample testing methodology set forth in the regulations governing claims concerning the presence of dietary supplements or nutrients in

15

food.[6]  Accordingly, the defendants contend that since the plaintiffs have only plead that their counsel retained two food laboratories to conduct three tests of the Product for ginsenosides, *see* Am. Compl. ¶ 56, the plaintiffs' claims must be dismissed.  The Court finds this argument misplaced.

To begin with, in order to trigger the 12-sample test regulation, the defendants argue that the plaintiffs' claims fall under two additional sections of the FDCA that govern the labeling of nutrients and dietary supplements.  Defs.' Mem. at 8.  First, the defendants point to section 343(q), which sets forth standards for food labels bearing nutritional information such as serving size, calories, total fat, saturated fat, cholesterol, sodium, total carbohydrates, complex carbohydrates, sugars, dietary fiber, total protein, vitamin, mineral, and other nutrients required to be placed on labels.  *See* 21 U.S.C.A. § 343(q) (West).  Specifically, subsections (1)(D) and (E) of that section, which is cited to in the defendants' memorandum, provide:

A food shall be deemed to be misbranded—

**(1)** . . . if it is a food intended for human consumption and is offered for sale, unless its label or labeling bears nutrition information that provides—

\*       \*       \*

 **(D)** the amount of the following nutrients: Total fat, saturated fat, cholesterol, sodium, total carbohydrates, complex carbohydrates, sugars, dietary fiber, and total protein contained in each serving size or other unit of measure,

**(E)** any vitamin, mineral, or other nutrient required to be placed on the label and labeling of food under this chapter before October 1, 1990, if the Secretary determines that such information will assist consumers in maintaining healthy dietary practices.

---

[6] The defendants contend that eleuthero is a "dietary supplement" and Panax is a nutrient.  Defs.' Mem. at 1.

21 U.S.C.A. § 343 (West).  As the defendants correctly note, pursuant to the regulations promulgated thereunder, compliance with section 343(q)(1)(D) and (E) can only be determined by using a 12-sample testing method.[7] *See* 21 C.F.R. §101.36(f)(1).

However, ginseng is not an "item" or "a nutrient" required to be included on a food label under section 343(q) and the FDA only requires the use of the 12-sample test to determine compliance with respect to the nutrients covered in that section.  Pl.'s Mem. at 7 (citing 21 CFR § 101.9 (c)).  In fact, 21 C.F.R. § 101.9(c) makes clear that "[n]o nutrients or food components other than those listed in [the paragraph] as either mandatory or voluntary may be included within the nutrition label."  21 C.F.R. § 101.9(c).  Mandatory items include, for example, polyunsaturated fats and sodium.  *Id.*  Voluntary items include items like fluoride and soluble fiber.  *Id.*  Ginseng is neither a mandatory nor a voluntary item.

Moreover, it warrants mention that the primary case cited to by the defendants for the proposition that a plaintiff must plead compliance with the FDA's 12 sample methodology involved a false advertising claim with respect an item required to be listed under 343(q).  Specifically, in *Melendez v. ONE Brands, LLC*, No. 18 CV 06650 CBA SJB, 2020 WL 1283793, at *3 (E.D.N.Y. Mar. 16, 2020), District Judge Amon was asked to consider whether a plaintiff was required to plead compliance with the FDA's 12-sample testing methodology in order to

---

[7] 21 C.F.R. §101.36(f)(1) provides that "[c]ompliance with this section will be determined in accordance with § 101.9(g)(1) through (g)(8), (g)(10), and (g)(11).  21 C.F.R. § 101.9(g) states:

(g)  Compliance with this section shall be determined as follows:

(1) A collection of primary containers or units of the same size, type, and style produced under conditions as nearly uniform as possible, designated by a common container code or marking, or in the absence of any common container code or marking, a day's production, constitutes  a "lot."

(2) The sample for nutrient analysis shall consist of a composite of 12 subsamples (consumer units), taken 1 from each of 12 different randomly chosen shipping cases, to be representative of a lot. Unless a particular method of analysis is specified in paragraph (c) of this section, composites shall be analyzed by appropriate methods as given in the "Official Methods of Analysis of the AOAC International," or, if no AOAC method is available or appropriate, by other reliable and appropriate analytical procedures.

assert a state law claim that an energy bar had been mislabeled.  There, the plaintiff claimed that the front label of the energy bar falsely stated that it contained only "1g sugar." Analyzing whether the plaintiff's state law claim was preempted, the Court noted that the 343(r) of the FDCA governs claims made on food labels that characterize the level of any nutrient required to be on a label by 343(q)(1) or (q)(2), including sugar.  Accordingly, in *Melendez*, the Court ruled that compliance with 343(r) could only be determined using the 12-sample methodology.  Since Melendez's state law claim was based on the results of one laboratory test, the Court held that the plaintiff was seeking to impose requirements different from those imposed by the FDCA.

Notably, all of the cases cited to by Judge Amon for the proposition that a plaintiff must plead compliance with the FDA's 12 sample methodology also involved the alleged mislabeling of nutrients required under 343(q)(1)(D) and (E).  *See e.g. Baker v. NNW, LLC*, Case No. 15–00222–CV–W–GAF, 2015 WL 12843827, at *4 (W.D. Mo. July 8, 2015) (dismissing claim as preempted where product purported to contain twenty-two grams of protein, one gram of carbohydrates, and just one gram of sugar); *Mee v. I A Nutrition, Inc.*, No. C–14–5006 MMC, 2015 WL 2251303, at *4 (N.D. Cal. May 13, 2015) (dismissing as preempted protein content claims); *Burke v. Weight Watchers Int'l, Inc.*, 983 F. Supp. 2d 478, 483 (D.N.J. 2013) (dismissing complaint as preempted where plaintiffs claimed defendant had misrepresented the number of calories in an entire line of ice cream bars).  While those decisions certainly found the 12-sample testing regulation applicable to claims made on both the front labels of food as well as information included in the traditional Nutrition Facts Panel, none of the cases involved an ingredient that is neither required by nor permitted to be included in a nutrition label.  As such, the undersigned finds the 12-sample testing methodology required for determining compliance with 343(q)(1)(D) and (E) is inapplicable in this case.

The defendants also argue that the plaintiffs' claims are governed section 343(q)(5)F, which also triggers the 12-sample testing regulation.  Section 343(q)(5)F provides:

> (F) A dietary supplement product (including a food to which section 350 of this title applies) shall comply with the requirements of subparagraphs (1) and (2) in a manner which is appropriate for the product and which is specified in regulations of the Secretary which shall provide that—
>
> (i) nutrition information shall first list those dietary ingredients that are present in the product in a significant amount and for which a recommendation for daily consumption has been established by the Secretary, except that a dietary ingredient shall not be required to be listed if it is not present in a significant amount, and shall list any other dietary ingredient present and identified as having no such recommendation;
>
> (ii) the listing of dietary ingredients shall include the quantity of each such ingredient (or of a proprietary blend of such ingredients) per serving . . ..

*Id.*  The FDA has defined dietary supplement products as "a product (other than tobacco) intended to supplement the diet that bears or contains one or more of the following dietary ingredients:  (A) a vitamin; (B) a mineral; (C) an herb or other botanical; and (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in clause (A), (B), (C), (D), or (E).  21 U.S.C.A. § 321 (West).  To this end, the defendants contend that the plaintiffs' claims are also governed by section 343(q)(5)F(ii) and 21 CFR 101.36 because "ginseng" is an herb or a dietary ingredient and eleuthero is a dietary supplement.  Defs.' Mem. at 1.

While it is true that dietary supplements are generally regulated in a similar manner to food, see *Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1035 (10th Cir. 2006), in this case, the Court is being asked to address whether a plaintiff must plead compliance with the 12-sample test regulation to escape federal preemption with respect to a claim involving the inclusion of a "dietary ingredient" in a beverage.  In contrast, the defendants' preemption

argument rests on the statute and regulations governing the labeling of dietary supplements.[8] Section 343(q)(5)F and 21 C.F.R. §101.36 may have applied in this case if the defendants were selling Siberian Ginseng in capsule form as a dietary supplement. However, as the plaintiffs correctly note, is it disingenuous to characterize AriZona's Green Tea with GINSENG and HONEY as a "dietary supplement" in order to dovetail it with the 12-sample test regulation. Indeed, if the defendants intended to have their drink treated as a dietary supplement, they would have been required to include a "Supplemental Facts" box providing information like "serving size," or in some cases "percent of the daily value." 21 C.F.R. § 101.36. Accordingly, the undersigned also finds section 343(q)(5)F to be inapplicable in this case.

In sum, there is nothing in the defendants' papers that suggests that the plaintiff's claims concerning the use of the term ginseng in violation of 21 U.S.C. § 343(u) are subject to the 12-sample test regulation. Accordingly, the undersigned recommends that the defendants' motion to dismiss based on the doctrine of conflict preemption be denied.[9]

### D.    Rule 9(b)

The defendants further argue that the plaintiffs' fraud and negligent misrepresentation claims, as well as the consumer fraud claims alleged by the California plaintiffs, lack specificity with respect to the laboratory tests conducted by the plaintiffs. To this end, the defendants contend that the plaintiffs have not included the actual test results from the two laboratories referenced in the amended complaint. Nor have the plaintiffs indicated whether the products

---

[8] It warrants mention that the FDA Import Alert 54-12, also draws a distinction between the dietary ingredient Eleutherococcus senticosus and a dietary supplement containing it. *See* Donovan Decl. Ex. B.

[9] Should the District Court disagree with the undersigned's recommendation regarding the defendants' preemption argument, the undersigned alternatively recommends that the plaintiffs be granted leave to amend with respect to the allegations of compliance with the 12-sample testing method. The Court finds that leave to amend is warranted given the defendants' admission that their product does not comply with the labeling requirements governing the term "ginseng." *See Parker v. Wal-Mart Stores, Inc.*, 367 F. Supp. 3d 979, 984 (E.D. Mo. 2019)(granting leave to amend where plaintiff failed to allege 12-sample testing).

tested were the 23-ounce cans or the gallon size, which are the only containers alleged to contain improper labels.  It is well-settled that "claims based on fraud are subject to the heightened pleading standard found in Fed. R. Civ. P. 9(b)." *F.D.I.C. v. U.S. Mortg. Corp.,* 132 F. Supp. 3d 369, 378–79 (E.D.N.Y. 2015). "In particular, a party asserting fraud 'must state with particularity the circumstances constituting fraud or mistake.'" *Id.* (citing Fed. R. Civ. P. 9(b)).  Accordingly, "Rule 9(b) is [only] satisfied when the complaint specifies 'the time, place, speaker, and content of the alleged misrepresentations;' how the misrepresentations were fraudulent; and the details that 'give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Id.* (quoting *Schwartzco Enters. LLC v. TMH Mgmt., LLC,* 60 F. Supp. 3d 331, 344 (E.D.N.Y. 2014)).

Although it is true that the plaintiffs have not included the actual test results in the amended complaint, stated the size of the defendants' Product that was tested or indicated whether the test results showed the presence of eleuthero, the Court finds that the allegations give rise to a strong inference that the defendants had knowledge of the falsity.  Indeed, the allegations in the amended complaint provide:

> Plaintiffs' counsel retained two respected food laboratories to conduct three tests of the Product for ginsenosides. Although various samples of the Product were tested using incredibly sensitive equipment, and the testing looked for measurable quantities of numerous ginsenosides, none of the three tests were able to detect any amount of any of the ginsenosides in the Product. Thus, the testing further shows that the Product contains either no true ginseng (i.e. from the Panax family) at all, or, at best, an amount of ginseng that is so miniscule that it cannot be detected even by scientific tests and could not provide energy to a consumer.
>
> The laboratories also tested several competing products made by other beverage producers. Like the Product, those competing products were advertised as containing ginseng. The labs confirmed that the products made by competing brands, such as Republic of Tea and Starbucks, do contain ginsenosides, showing that true ginseng was used to make those products.

> Defendants sell millions of containers of the Product each year and use a standardized, industrial manufacturing process, which results in the same liquid with the same proportions of ingredients being put into every individual container.
>
> Plaintiffs' testing, showing an absence of ginsenosides, is consistent with the statement on Defendants' website that they use "Siberian Ginseng" (that is, eleuthero) instead of Panax ginseng in violation of state and federal law.

While the plaintiffs' simply allege that "various samples of the Product" were tested, the defendants are hard-pressed to complain that the allegations lack sufficient particulars as to the alleged misrepresentation.  This is especially true given the defendants' acknowledgment that the Product is made with eleuthero.  In other words, the defendants cannot genuinely argue that the complaint lacks sufficient information to put them on notice as to the circumstances of the charged misrepresentations.  Moreover, the defendants will certainly learn through discovery which Products were tested and what the test results revealed.  Accordingly, the undersigned recommends that the defendants' motion with respect to the common law fraud and misrepresentation claims, as well as their motion with respect to the consumer fraud claims asserted by the California plaintiffs, be denied.

### E.    Notice – The California Consumer Legal Remedies Act Claim

The defendants also argue that to the extent the California plaintiffs have based their CLRA claim on the defendants' website statement that the Product is made with "Siberian Ginseng," the plaintiffs have failed to comply with the CLRA's notice provisions.  Under Cal. Civ. Code § 1782(a), a consumer must give notice at least thirty days before commencing an action for damages pursuant to the statute.  *Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 949–50 (S.D. Cal. 2007).  Specifically, section 1782(a) provides:

> (a) Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following:

(1) Notify the person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770.

(2) Demand that the person correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770.

Cal. Civ. Code § 1782 (West).  The California statute further provided that with limited exception "no action for damages may be maintained under [the section] if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice." *Id.* While "[t]he CLRA's notice requirement is not jurisdictional," "compliance with this requirement is necessary to state a claim." *Cattie,* 504 F. Supp. 2d at 949–50 (citing *Outboard Marine Corp. v. Superior Court*, 52 Cal. App. 3d 30, 40–41, 124 Cal. Rptr. 852 (1975)).

In this matter, the California plaintiffs included a claim for damages under the CLRA in their initial complaint filed on April 2, 2019 in the Northern District of California.  *See* Donovan Dec., Ex. A.  In that complaint, they alleged that pre-suit notice was provided in letters mailed to the defendants on dated October 22, 2018 and October 26, 2019.  *Id.*  When the plaintiffs filed the amended complaint in this action, the claims brought under the CLRA were incorporated into the third cause of action.  Notably, the plaintiffs assert:

Defendants' actions, representations and conduct have violated, and continue to violate the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq., because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.  Plaintiffs and class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).  The Products that California Plaintiffs (and other similarly situated class members) purchased from Defendants were "goods" within the meaning of California Civil Code § 1761(a).

Throughout the last four years, and beyond, Defendants have unfairly, deceptively, and misleadingly advertised and represented to Plaintiffs and class members that the Product is "Green Tea with GINSENG" and contains "Ginseng for energy." But Defendants failed to inform Plaintiffs and class

23

members that the Product does not contain any ginseng, that it does not contain ginseng sufficient to provide energy to consumers, and that it instead contains eleuthero.

Am. Compl. ¶¶ 129-30.  In addition, the plaintiff allege that on September 11, 2019, Judge William H. Orrick determined that the claims of the California plaintiffs should be transferred to this Court, but before the case was transferred, the plaintiffs had filed declarations in accordance with California Civil Code section 1780(d).  *Id.* ¶ 31.

According to the defendants, while the notices they received from the California plaintiffs generally allege that the defendants have violated the CUCL, CFAL and CLRA in connection with the defendants' marketing, advertisement and sale of their Green Tea with Ginseng beverage, the notices fail to mention the website statements concerning the use of Siberian Ginseng.  Instead the two notices letters, as well as a subsequent letter sent to BMU, reference the alleged lack of ginsenosides, the labeling of the defendants' Product as having "ginseng for energy," and the statement that the Product contains "just the right amount of ginseng," which has since been ruled to be puffery.  As such, the defendants contend that the plaintiffs' claim based upon the website statement "Siberian Ginseng" is barred for failure to provide pre-suit notice.  The Court disagrees.

The defendants argument rests on a single paragraph in the amended complaint, which references the defendants' admission on their website that they use Siberian Ginseng in the Product.  *Id.* ¶ 48.  While the plaintiffs are likely to introduce the website as evidence that the Product's label is misleading, the defendants' characterization of the California plaintiffs' claims is far too narrow.  The California plaintiffs are not basing their CLRA claim on the statement made by the defendants on their FAQ page.  Rather, they generally assert that the labels on the defendants' Product "with GINSENG" and "Ginseng for energy" are false and misleading.

24

Consistent with this broad claim, the plaintiffs' notice letters address the lack of ginsenosides or ginseng despite the labeling of Product as having "ginseng for energy."  Moreover, it is clear that the plaintiffs do not intend to argue that they relied on the website statement when they purchased the Product.  In fact, the plaintiffs point out, they were unaware of the website when they made their purchases.  Accordingly, the plaintiffs were not required to reference the defendants' website statement in the pre-suit notice letters.  Thus, the undersigned recommends that to the extent the defendants seek to dismiss the plaintiffs' CLRA claim, the motion be denied.

> ### F.      Notice – The Breach of Warranty Claim

With respect to the fifth cause of action sounding in breach of express warranty, the defendants similarly argue that the California plaintiffs failed to furnish them with sufficient notice of the breach of warranty claim.  In support of this argument, the defendants rely on a provision of the California Commercial Code, which mimics a provision of the Uniform Commercial Code.  Specifically, Cal. Com. Code § 2607(3) provides:

> Where a tender has been accepted:
>
> (A) The buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy.

Accordingly, "to avoid dismissal of a breach of contract or breach of warranty claim in California, '[a] buyer must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach.'" *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011) (citing *Stearns v. Select Comfort Retail Corp.*, 763 F.Supp.2d 1128, 1142 (N. D. Cal. 2010)).  While the notices referenced in the amended complaint do not mention the plaintiffs' claim for breach of warranty, such notice was not required because the suit is

against the defendants in their capacity as a product manufacturer, not as a seller.  *See Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012)(when claims are against a defendant in its capacity as a manufacturer, not as a seller, plaintiff is not required to give notice).  In this case, it is clear that the named plaintiffs purchased the beverages from third party sellers and did not deal with the defendants directly notwithstanding the fact that the plaintiffs have defined ABU as a manufacturer and seller of the Product.  Am. Compl.  ¶¶ 5, 21-3, 27, 78-87.  Accordingly, the undersigned recommends that the defendants' motion to dismiss the breach of warranty claim be denied.

### G.     Motion to Strike the Class Claims

Finally, the defendants seek to strike the nationwide class claims pursuant to Fed. R. Civ. P. 12(f).  As noted above, the plaintiffs seek to represent groups of similarly situated persons, which they have defined as "All persons who, between April 1, 2015 and the present, purchased the Arizona Green Tea with Ginseng and Honey in any state in the United States (the "Class")."  Am. Compl. ¶ 92.  The defendants urge the Court to strike the class claims at this time because the plaintiffs have not, and will not, meet the "predominance" or "commonality requirement" of Fed. R. Civ. P. 23 given the fact that fifty individual state laws govern the plaintiffs' class claims.  While the defendants may ultimately prevail on this issue, the undersigned finds this argument to be premature and recommends that the defendants' motion to strike the class claims be denied with leave to review at the class certification stage.  *See Hidalgo v. Johnson & Johnson Consumer Companies, Inc.*, 148 F. Supp. 3d 285, 296–97 (S.D.N.Y. 2015).

### OBJECTIONS

A copy of this Report and Recommendation is being electronically served by the Court on the parties.  Any objections to this Report and Recommendation must be filed with the Clerk

of the Court with a courtesy copy to the undersigned within 14 days.  Failure to file objections

within this period waives the right to appeal the District Court's Order.  See 28 U.S.C. §

636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS

28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to

the Magistrate's finding" by failing to timely object); *Wagner & Wagner, LLP v. Atkinson,*

*Haskins, Nellis, Brittingham, Gladd & Carwile, P.C*., 596 F.3d 84, 92 (2d Cir. 2010); *Beverly v.*

*Walker,* 118 F.3d 900, 902 (2d Cir. 1997).


Dated:  Central Islip, New York
           July 19, 2020

                                                    _____/s_____
                                                    ARLENE R. LINDSAY
                                                    United States Magistrate Judge